UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

National Bankcard Services, Inc.,

        Plaintiff,

v.

Family Express Corporation,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 04-5065 ADM/AJB

___

Thomas J. Conley, Esq., Leonard, Street and Dienard, P.A., Minneapolis, MN, argued for and on behalf of Plaintiff.

David P. Irmscher, Esq., Baker & Daniels LLP, Fort Wayne, IN, argued for and on behalf of Defendant.

___

## I. INTRODUCTION

On June 27, 2006, oral argument before the undersigned United States District Judge was heard on Plaintiff National Bankcard Services, Inc.'s ("NBS") Motion for Partial Summary Judgment [Docket No. 52]. Additionally, Defendant Family Express Corporation's ("FEC") Motion for Summary Judgment [Docket No. 84] is before the Court. In its Complaint ("Complaint") [Docket No. 1], NBS alleges FEC breached the contract between the two parties. FEC has filed a Counterclaim [Docket No. 31], claiming NBS also breached the same contract.[1] NBS's Motion for Partial Summary Judgment is granted, FEC's Motion for Summary Judgment is denied, and NBS's Motion to Strike Affidavit [Docket No. 75] is denied.

## II. BACKGROUND

Plaintiff NBS is a privately held corporation that specializes in providing data processing

___

[1] FEC has stipulated to dismissal of its unjust enrichment and conversion counterclaims [Docket Nos. 87, 95].

services. Defendant FEC is a privately held corporation that owns and operates a number of gas stations and convenience stores in Indiana. Horn Decl. [Docket No. 73] ¶ 2. In April 2004, NBS and FEC entered into a Service Agreement under which NBS was to provide FEC with electronic payment authorizations for all of FEC's stores. Id. ¶ 3; Service Agreement (Conley Aff. [Docket No. 18] Ex. 1).

The Service Agreement states that: "[NBS] will electronically authorize and capture Visa, MasterCard, Discover, American Express, Diners, WrightExpress, Voyager, SCS prepaid, debit, and possibly in the future FleetOne and loyalty card transactions for [FEC]." Service Agreement at Ex. A. The Service Agreement also provided for an initial term of 36 months:

> [FEC] agrees to utilize the Services in accordance with this Agreement, its exhibits or attachments and NBS's instructions and specifications and to provide NBS with the necessary data in the proper format to enable NBS to properly furnish Services. Except for the first 4 months, [FEC] further agrees that the NBS Services are the sole and exclusive authorization and capture services for [FEC's] retail sites during the initial term of this Agreement, and that it will not utilize such services from any other provider, including but not limited to itself.

Id. ¶ 5. The Service Agreement also contains a termination provision, which states in part:

> [I]n the event that either party hereto fails in the performance of its obligations hereunder or breaches the terms or conditions hereof, the other party may, at its option, give written notice to the party which has failed to perform or has breached this Agreement of its intention to terminate this Agreement unless such breach or failure in performance is remedied within ten (10) days of such notice. Failure to remedy such a breach shall make this Agreement terminable, at the option of the aggrieved party, at the end of such ten (10) day period unless notification is withdrawn.

Id. ¶ 3(b). Finally, the Service Agreement contains a limitation of liability clause:

> NBS agrees to use its best effort at all times to provide prompt and efficient service; however, NBS makes no warranties or representations regarding the Services except as specifically stated in this Paragraph 6.b. NBS shall use due care in processing all work submitted to it by [FEC] and agrees that it will, at its expense, correct or pay [FEC] reasonable costs of such correction jointly decided by NBS and [FEC], any errors which are due solely to malfunction of NBS's computers, operating systems or programs, or

>errors by NBS's employees or agents.  Correction shall be limited to rerunning of the job or jobs and/or recreating of data or program files. . . . THIS WARRANTY IS EXCLUSIVE AND IS IN LIEU OF ALL OTHER WARRANTIES, AND [FEC] HEREBY WAIVES ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE FOR A PARTICULAR PURPOSE.

Id. ¶ 6(b).

At the time the contract was executed, FEC understood NBS was providing new software that had not yet been tested on the type of equipment FEC employed.  Horn Dep. (Conley Aff. [Docket No. 79] Ex. C) at 17; Laroux Dep. (Conley Aff. [Docket No. 79] Ex. A) at 42-43.  The Vice President of Information Technology at FEC recognized the likelihood of bugs in the software.  Laroux Dep. at 43.

NBS first provided service to an FEC store in June 2004.  Little Dep. (Conley Aff. [Docket No. 79] Ex. B) at 143-44.  Although the Service Agreement implied that NBS's services would be operational in all FEC stores within four months of the execution of the Service Agreement, NBS and FEC agreed to resolve all implementation issues related to NBS's services prior to rolling out service to all FEC stores.  Id.  Implementation issues arose when NBS's services were installed at the first FEC store in Valparaiso, Indiana.  FEC received all the materials it needed to install NBS's services by May 5, 2004, however, because of limited resources FEC did not begin installation until May 24.  Laroux Dep. at 29-31.  FEC maintained responsibility for the installation of NBS services.  Id.  On June 16, 2004, FEC began using the NBS services at the Valparaiso store.  Horn Decl. ¶ 13.  However, NBS was unable to process debit card transactions on that day.  Id. ¶ 14.  Until November 2004, problems cropped up with NBS services at the Valparaiso store, occasionally "locking up" the pumps and failing to process payments.  Id. ¶ 15.  It also took two months for NBS to accept for processing SVS gift cards.

Id. ¶ 18.  Finally, in November 2004, the Valparaiso store began accepting WrightExpress cards. Id. ¶ 19.  However, NBS remained unable to process these cards at the time FEC terminated its services.  Id.; Stanley Dep. (Glazner Decl. [Docket No. 72] Ex. 1) at 48-49, 51-60.

Also in November 2004, NBS services were implemented at the grand opening of FEC's Plymouth, Indiana store.  Horn Decl. ¶ 23.  Throughout opening day, NBS's services caused the gas pumps to "lock up," leading to double charges of customers utilizing debit cards for payment.  Id. ¶ 24.  Additionally, customers were unable to electronically purchase car washes at the gas pumps.  Id. ¶ 26.

It is undisputed that FEC controlled the remainder of the "roll out" schedule following the first implementation of NBS services at the Valparaiso store.  Laruox Dep. at 68-69; Horn Dep. at 52; Little Dep. at 93-94, 143-46.  NBS agreed to allow FEC to implement NBS services beyond the four month period specified in the Service Agreement.  Little Dep. at 159-60.  It is also undisputed that when problems arose at the Valparaiso and Plymouth stores, NBS was responsive to these issues.  DeWitt Dep. (Conley Aff. [Docket No. 79] Ex. D) at 11-13.

On November 15, 2004, FEC's Chief Financial Officer, Monique Horn, sent an email to other FEC executives summarizing a conversation she had with a consultant from Impact21, who reported that a company called Concord EFS could provide authorization services for a lower price than NBS.  November 15, 2005 Email (Conley Aff. [Docket No. 101] Ex. 2).  The email stated, in part: "[The consultant] will contact NBS today with our ultimatum pricing scenario.  I explained that it just doesn't make good business sense to incur the expense of switching to NBS when their rates are not competitive.  Not their fault, nor our fault, it just 'is'."  Id.  Two weeks later, FEC made the decision to switch to Concord EFS.  Laroux Dep. at 69.  In mid-January

4

2005, the switch to Concord EFS occurred, and NBS has not provided services to FEC since that time.  Id. at 104.

NBS bases its breach of contract claim on the allegation that FEC has failed to implement its services at all of its stores, and has used third parties to provide credit authorization services in violation of the Service Agreement without properly terminating the Service Agreement.  Compl. ¶¶ 6-10.  FEC's counterclaim is premised on the allegation that NBS breached the contract by failing to provide operation services as identified in the Services Agreement.  Counterclaim ¶¶ 26-33.  NBS's Motion seeks summary judgment on both its and FEC's breach of contract claims.

### III. DISCUSSION

**A.      Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

B.   **NBS's Breach of Contract Claim**

NBS first moves for summary judgment on its breach of contract claim, arguing that FEC has violated the Service Agreement by violating the exclusivity provision of the Service Agreement. NBS also avers that FEC failed to terminate NBS as required by the Service Agreement.

To demonstrate a breach of contract, a party must show: "(a) the formation of the contract; (b) performance by plaintiff of any conditions precedent to his right to demand performance by defendant; and (c) a breach of the contract by defendant." Briggs Transp. Co. v. Ranzenberger, 217 N.W.2d 198, 200 (Minn. 1974). In the instant lawsuit, the first element is undisputed. Answer [Docket No. 31] ¶ 6. As to the second element, the Service Agreement sets no conditions precedent to the performance of the contract. "Courts should not construe contract provisions to be conditions precedent 'unless required to do so by plain, unambiguous language or by necessary implication.'" James E. Brady & Co., Inc. v. Eno, 992 F.2d 864, 869 (8th Cir. 1993) (citation omitted). Although FEC argues that providing non-breaching services was a condition precedent to FEC's performance, this argument is unavailing. There is no dispute that NBS did provide services to the two stores where FEC allowed implementation. Although issues may have arisen as to the services provided, there is no plain, clear language in the Service Agreement requiring NBS to implement a system free of bugs without opportunity to remedy technical problems. Reading this type of requirement into any contract involving computers or software would render virtually every provider of computer services or software in breach of their contracts. Moreover, FEC executives recognized that technical glitches were a likelihood. Laroux Dep. at 43. Absent language specific to FEC's claim, no condition precedent is found in

the Service Agreement.

The third element, whether the Service Agreement was breached, is also met in this case. NBS has identified two breaches, supported by facts that present no genuine issue of dispute. First, NBS argues that FEC violated the exclusivity provision of the Service Agreement by hiring Concord EFS.  FEC does not dispute that it hired Concord EFS.  The Service Agreement clearly states that, four months after the Service Agreement was signed, no third party would be allowed to provide authorization services to FEC.  Service Agreement ¶ 5.  Second, it is undisputed that FEC failed to give written notice to NBS of its alleged failure of performance or breaches, and did not provide NBS with ten days to cure any such breaches.  Horn Dep. at 9; Horn Decl. ¶ 36.  As a result, FEC violated the termination provision of the Service Agreement. Service Agreement ¶ 3(b).  Minnesota courts have held that termination provisions must be enforced.  "A provision in a contract for the termination thereof upon certain conditions can be enforced only in strict compliance with the terms of these conditions."  Blaine Econ. Dev. Auth. v. Royal Elec. Co., Inc., 520 N.W.2d 473, 476 (Minn. Ct. App. 1994).  Because the three elements of breach of contract are not in dispute, NBS has demonstrated a prima facie case that FEC breached the Service Agreement.

FEC, however, offers a number of defenses for breaching the Service Agreement.  First, FEC avers that its failure to terminate the contract without first notifying NBS of its alleged breach and allowing NBS an opportunity to cure is not a breach, as any demand to NBS would have been futile.  FEC relies on the fact that at the time it contracted with Concord EFS, NBS was only providing authorization services at two of its 44 stores, when the Service Agreement called for NBS to be providing services in all 44 stores within four months of execution of the

Service Agreement. FEC argues that, even given a ten day cure period, NBS could not have remedied this breach. Therefore, giving notice to NBS of its alleged breach would have been futile. FEC cites AAMCO Indus., Inc. v. DeWolf, 250 N.W.2d 835 (Minn. 1977), as well as several cases from other jurisdictions, to support the futility argument. AAMCO, however, interprets not a contract, but rather a Minnesota statutory provision requiring a franchisor to allow a franchisee 24 hours to cure a default under a franchise agreement. Id. at 839-40. Moreover, the cure in that instance required the recovery of the qualitative concept of "good will." Id. Here, the performance of NBS can be measured quantitatively. The only facts proffered by FEC to suggest that NBS could not have cured its alleged breach in ten days are the performance of NBS at the Valparaiso and Plymouth stores over the preceding six months. Although those stores did incur implementation issues, the implementation was timely. No evidence has been presented by FEC to show that NBS could not have installed its services in the remaining stores in ten days.

In a similar argument, FEC contends NBS incurably breached its agreement by not implementing NBS services in all 44 stores in the first four months after the execution of the Service Agreement. However, it is undisputed that FEC controlled the NBS roll out schedule, and requested that implementation be delayed until all bugs in the system were fixed. Laroux Dep. at 68-69; Horn Dep. at 52; Little Dep. at 143-44. "A party may be estopped from challenging an act unauthorized by a contract when the party has ratified the act." Logan v. Norwest Bank Minnesota, N.A., 603 N.W.2d 659, 664 (Minn. Ct. App. 1999). Here, NBS was willing to implement its services to FEC stores at all times, but was held up by FEC's schedule. Laroux Dep. at 68-69; Horn Dep. at 52. Because FEC can not demonstrate that it would have

been futile to notice NBS of its alleged breach and give it ten days to cure it, this defense fails.

Next, FEC claims that NBS's inability to provide the services spelled out in the Service Agreement frustrated the purpose of the contract.  Frustration of purpose is demonstrated when: "(1) The party's principal purpose in making the contract is frustrated; (2) without that party's fault; (3) by the occurrence of an event, the nonoccurrence of which was a basic assumption on which the contract was made."  Metro. Sports Facilities Comm'n v. General Mills, Inc., 460 N.W.2d 625, 630 (Minn. Ct. App. 1990) (citation omitted).  Although subjectively, FEC may have experienced frustration in its attempts to get fully operational NBS services implemented in its stores, FEC has failed to demonstrate the three legal elements required here.  As previously discussed, no evidence has been presented that NBS could not have installed its services at all 44 FEC stores.  Rather, FEC did not allow NBS to do so after the implementation issues arose at the first two stores.  Additionally, providing initial problem-free services was not one of the basic assumptions of the contract.  The evidence shows that NBS worked to solve the problems FEC experienced with its services.  DeWitt Dep. 11-13.  FEC even acknowledged the efforts of NBS.  Id.  As a result, FEC can not demonstrate that the requirements of frustration of purpose have been met.

Finally, FEC argues throughout its opposition memorandum that NBS failed to provide "commercially reasonable" services.  However, FEC cites no authority for the proposition that NBS was required to meet this standard under the Service Agreement.  The limitation of liability section of the Service Agreement clearly disclaims any warranties not explicitly set forth in that section.  Service Agreement ¶ 6(b).  Although the concept of commercial reasonableness is contained within the Uniform Commercial Code, no authority is presented to suggest it applies

to the Service Agreement here.

**C.    FEC's Breach of Contract Counterclaim**

NBS also moves for summary judgment on FEC's counterclaim, arguing that the limitation of liability section of the Service Agreement disclaims all warranties not expressly stated in the Service Agreement. Service Agreement ¶ 6(b). FEC also moves for summary judgment on this claim. The limitation of liability section of the Service Agreement limits NBS's liability to using due care, and to correcting at its expense any implementation problems that arise. The language of the limitation of liability clause is sufficient to disclaim any implied warranties. See, e.g., Minnesota Forest Products, Inc. v. Ligna Machinery, Inc., 17 F.Supp.2d 892, 916-17 (D. Minn. 1998). FEC has offered insufficient evidence to demonstrate that this express warranty has been breached. Although it is undisputed that issues arose with the implementation of NBS's services, nothing suggests that the problems were so pervasive as to override the limitation of liability clause. Furthermore, FEC's claim that NBS's agreement in Exhibit A of the Services Agreement to provide authorization services overrides this disclaimer is unavailing. If anything, the disclaimer demonstrates that the parties expected that the services provided would not be bug-free. Moreover, it is undisputed that FEC executives were aware bugs were a likelihood during implementation, that NBS worked to correct the bugs in its services, and FEC executives felt that NBS worked to solve problems. Laroux Dep. at 43; DeWitt Dep. 11-13. The undisputed facts do not demonstrate that NBS breached the contract. Thus, NBS's Motion is granted.

**D.      Motion to Strike Affidavit**

NBS moves to strike the affidavit of Monique Horn, claiming it is contrary to deposition testimony offered by FEC, and that she does not have personal knowledge of the subjects on which she offers testimony. However, even considering Horn's affidavit, NBS's Motion for Partial Summary Judgment is granted. Therefore, the Motion to Strike Affidavit is denied as moot.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff National Bankcard Services, Inc.'s Motion for Partial Summary Judgment [Docket No. 52] is **GRANTED**;

2.      Defendant Family Express Corporation's Motion for Summary Judgment [Docket No. 84] is **DENIED**; and

3.      Plaintiff National Bankcard Services, Inc.'s Motion to Strike Affidavit [Docket No. 75] is **DENIED**.

                                                BY THE COURT:

                                                        s/Ann D. Montgomery
                                                ANN D. MONTGOMERY
                                                U.S. DISTRICT JUDGE

Dated:  August 29, 2006.